## THE INTERNATIONAL.

(Circuit Court of Appeals, Second Circuit. January 15, 1919.)

No. 92.

1. NAVIGABLE WATERS ☞20(1)—INTERNATIONAL BRIDGE AT BUFFALO—DUTY TO MAINTAIN HELPING TUG.

International Bridge Company, incorporated by New York and Canada in 1857 to build and operate a bridge over Niagara river at Buffalo, and whose charter was confirmed by Congress by Act June 30, 1870, remains subject to the provisions of the state charter, which require it to keep always at hand a tug to help without charge both sail and steam vessels desiring to pass through the draw.

2. ADMIRALTY ☞28—BRIDGE—NEGLIGENCE IN OPERATION OF DRAW.

The failure of a tug, maintained by a bridge company to help vessels passing through the draw, to come promptly to the assistance of a vessel signaling, by reason of which she was injured, gives no right of action in rem, but does give a right of action in personam against the owner.

3. NAVIGABLE WATERS ☞20(8)—INJURY TO VESSEL FROM NEGLIGENT OPERATION OF BRIDGE—DAMAGES.

The proof must be very clear to warrant allowance of damages for depreciation of a vessel because of an injury, beyond the allowance for cost of repairs.

Appeal from the District Court of the United States for the Western District of New York.

Suit by William L. McFadden and others, owners of the steamer Albert T. Gowen, against the tug International and the International Bridge Company. Decree for libelants, and respondent Bridge Company appeals. Modified and affirmed.

Rebadow, Ladd & Brown, of Buffalo, N. Y., for appellant.

Moot, Sprague, Brownell & Marcy, of Buffalo, N. Y., for appellees.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. July 12, 1915, at about 7:30 a. m., the steamer Albert T. Gowen was lying at anchor on the west side of Squaw Island in the Niagara river, with her bow heading toward the island, sucking sand and gravel from the river bed. The river runs north and south, and is crossed by the International Bridge between Buffalo, in the state of New York, and the Dominion of Canada at a point some 600 feet above where the steamer was lying. Her bow began to swing upstream and she herself to drag her anchor. She blew a signal for the opening of the draw and went slowly down the river with the current, using her engines to help keep her in the channel, so that she might pass through the draw at the east end of the bridge. The draw was opened timely, but she finally brought up on the west side of the riprap, which acts as an ice breaker for Pier 8.

[1] The respondent, International Bridge Company, was incorporated by chapter 753 of the Laws of 1857 of the state of New York, and another corporation of the same name was incorporated by the Dominion of Canada. St. 20 Vict. c. 227. Section 2 of the New York act provides:

"Section 2. The draws of said bridge shall be of ample width to give free and unobstructed passage to all steamboats and other vessels navigating said river or Lake Erie; they shall be at all times tended and moved at the expense of said company, so as not to hinder or delay, unnecessarily, the passage of any steamboat or vessel. From sundown until sunrise, during the season of lake navigation, suitable lights shall be maintained upon said bridge to guide vessels or steamboats approaching said draws, and shall at all times keep in readiness one or more steamboats or steamtugs, suitable for towing such vessels through such draws, and shall tow all sail vessels through said draws, whenever requested so to do by the officers of such sail vessels on their regular passage up or down the river or harbor, without charge; and said company, shall be liable to pay owners of any steamboat or vessel, or the cargoes thereof, all damages which they may sustain, by reason of any neglect of the provisions of this section."

Section 12 of the Canadian act provides:

"XII. The said bridge shall be constructed so as not materially to obstruct the navigation of the Niagara river. The said bridge shall have two draws—which said draws shall be of ample width to give free and unobstructed passage to all steamboats and other vessels navigating the said river; the said draws shall be at all times tended and moved at the expense of the said company so as not to hinder unnecessarily the passage of any steamboats or vessels; from sundown until sunrise during the season of navigation suitable lights shall be maintained upon the said bridge to guide vessels and steamboats approaching the draws; and for assisting the passage of any vessel through the said draws, the said company shall at all times keep in readiness one or more steamboats or steam tugs suitable for towing the said vessels through the said draws and shall tow all the said vessels through the same, whenever requested so to do by the officers of such vessels on their regular trips up and down the river or harbor without charge; and the said company shall be liable to pay the owners of any steamboat or vessel, or the cargoes thereof, all damages which they may sustain by reason of any neglect of the provisions of this section."

The two corporations were consolidated by chapter 550, Laws 1869, of the state of New York, which imposes on the new corporation all the duties prescribed by the original acts. People v. International Bridge Co., 223 N. Y. 144, 119 N. E. 351.

Congress by Act June 30, 1870, c. 176, 16 Stat. 173, confirmed the charter, so making the bridge to be thereafter built in accordance with the requirements of the act of 1869 a lawful structure over navigable waters of the United States. It provided:

"Any bridge and its appurtenances which shall be constructed across the Niagara river, from the city of Buffalo, New York, to Canada, in pursuance of the provisions of an act of the Legislature of the state of New York, entitled 'An act to incorporate the International Bridge Company,' passed April 17, 1857, or of any act or acts of said Legislature now in force, amending the same, shall be lawful structures, and shall be so held and taken, and are hereby authorized to be constructed and maintained as provided by said act and such amendments thereto; * * * but this act shall not be construed to authorize the construction of any bridge which shall not permit the free navigation of said river to substantially the same extent as would be enjoyed under the provisions of said act and the amendments thereto."

256 F.—13

The bridge was actually constructed between 1870 and 1874.

We have no difficulty in construing the acts to mean that the Bridge Company shall keep always at hand a tug to help both sail and steam vessels wanting to pass through the draw, which it has done continuously for the last 40 years.

The libel is in tort, in rem against the tug and in personam against the Bridge Company, for failure to perform a maritime duty imposed by statute, and the negligence charged is, first, that the tug, though signaled for, did not come promptly to the steamer's assistance as she might have done, and so have prevented the damage; second, that the master of the tug, when helping the steamer off the riprap, instead of taking a line from her bow, as he was requested to do, took it from her stern, with the result that the port bow and side of the steamer struck the riprap with great violence, sustaining severe damage.

In respect to the second charge, Judge Hazel found that the major injuries to the steamer occurred when the tug was helping her off the riprap; that the extent of the tug's duty was to exercise ordinary care and skill according to the circumstances; that the situation presented many difficulties, and, if the master of the tug did not take the wisest course, still he failed only in the matter of judgment, for which neither the tug nor its owner is liable.

In respect to the first charge, the District Judge held that the tug had failed to come to the assistance of the steamer with reasonable promptness, and that if she had done so the accident would not have happened.

Both these conclusions are or depend upon findings of fact, which in accordance with our practice we would not disturb, unless we thought them clearly erroneous, which we do not.

[2] The failure of the tug to come promptly to the assistance of the steamer gives no right in rem, though it does a right in personam against the owner.

It is contended as matter of law that the act of Congress alone applies to the bridge, and that, as it says nothing about the employment of a tug by the Bridge Company, no such obligation exists. Under its power to regulate commerce the United States has always had a right to prevent obstruction of its navigable waters by bridges, even when constructed under state statutes, and has often exercised this right by approving such structures, as in this case, by special acts, Pennsylvania v. Wheeling Bridge, 13 How. 630, 14 L. Ed. 249; Union Bridge Co. v. United States, 204 U. S. 364, 400, 27 Sup. Ct. 367, 51 L. Ed. 523. Since the passage of chapter 907, § 7, Act Sept. 19, 1890, 26 Stat. 426, 454, no bridge can be erected over such waters without first obtaining the approval of the Secretary of War. See, also, chapter 425, Act March 3, 1899, 30 Stat. 1151. These acts establish a uniform method of procedure, which saves Congress the trouble of special acts legalizing such structures.

We think the act of Congress was intended simply to make the bridge a legal structure and not to regulate the management of it. It cannot be supposed that there was any intention to relieve the Bridge Company of such very obvious and necessary duties as were imposed

upon it by the said statute; e. g., opening the draw, in setting lights, or in supplying a tug to help vessels to pass under it in safety. Upon these subjects Congress did not speak, and therefore left them within the power of the state. Indeed, the language of the act seems to confirm the state regulations:

"Chapter 176, Act June 30, 1870. An act to authorize the construction and maintenance of a bridge across the Niagara river.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that any bridge and its appurtenances which shall be constructed across the Niagara river, from the city of Buffalo, New York, to Canada, in pursuance of the provisions of an act of the Legislature of the state of New York, entitled 'An act to incorporate the International Bridge Company,' passed April 17, 1857, or of any act or acts of said Legislature now in force, amending the same, shall be lawful structures, and shall be so held and taken, and are hereby authorized to be constructed and maintained as provided by said act and such amendments thereto, anything in any law or laws of the United States to the contrary notwithstanding, and such bridge shall be, and is hereby, declared to be an established postroad for the mails of the United States; but this act shall not be construed to authorize the construction of any bridge which shall not permit the free navigation of said river to substantially the same extent as would be enjoyed under the provisions of said act and the amendments thereto, heretofore enacted and now in force: Provided, nevertheless, that the location of any bridge, the construction of which is hereby authorized, shall be subject to the approval of the Secretary of War, but not to be located south of Squaw Island: And provided further, that such bridge shall have at least two draws of not less than one hundred and sixty feet in width, in the clear between the piers, which shall be located at the points best calculated to accommodate the commerce of said river; and the piers of said bridge shall be parallel to the current of said river.

"Sec. 2. And be it further enacted, that the bridge herein named shall be subject, in its construction, to the supervision of the Secretary of War of the United States, to whom the plans and specifications, relative to its construction, shall be submitted for approval. And all railway companies desiring to use the said bridge shall have and be entitled to equal rights and privileges in the passage of the same and in the use of the machinery and fixtures thereof and of all the approaches thereto, under and upon such terms and conditions as shall be prescribed by the District Court of the United States for the Northern District of New York, upon hearing the allegations and proofs of the parties, in case they shall not agree. * * *"

[3] The accounting before the commissioner seems to us to do justice, except that there should be no allowance for depreciation in value. The proofs ought to be very clear to sustain such finding. The court below is directed to strike out this allowance, and, so modified, the decree is affirmed. There will be no costs of this appeal.