FIX v. INTERNATIONAL BRIDGE CO.
No. 144.

Circuit Court of Appeals, Second Circuit.
Jan. 27, 1941.

138

Stanley & Otten, of Buffalo, N. Y. (Arthur E. Otten, of Buffalo, N. Y., of counsel), for appellant.

Moot, Sprague, Marcy & Gulick, of Buffalo, N. Y. (Welles V. Moot and Leonard W. M. Zingler, both of Buffalo, N.Y., of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The libellant appeals from a decree dismissing a libel to recover damages for injuries to his ferry by a collision with the respondent's bridge across the Niagara River below the City of Buffalo. He based liability upon a provision of twin statutes of New York and the Dominion which granted a franchise to build the bridge, and the only question which we shall consider is whether the respondent violated the duty imposed upon it as a condition of the grant. Since the collision occurred on the Canadian side of the river, it was the Canadian statute which imposed whatever liability there was, and we shall therefore confine ourselves to the Canadian text, though it really does not differ in substance from the American. The relevant section (§ 13 of Chapter 227, 20 Vict.Dom.Canada) appears in the margin.[1]

The libellant operated a ferry from Buffalo to Fort Erie, Ontario; a little less than a mile above the bridge, which has seven fixed spans, all too low for the ferry to pass under, and an eighth which has two draws. The river flows at between six and ten miles an hour depending on the wind, and the passage of the draws is always difficult and dangerous; for this reason the statutes required the respondent to keep always at hand a fully-manned and equipped tug to help any vessel through them. This it has always done, except that it has been its practice for many years to take the tug out of commission during the winter, that is, when the "season of navigation" in the river was closed, which is roughly from the middle of December to the middle of April. During these months navigation ceases upon Lake Erie and, while some traffic continues up and down the river between Buffalo and Niagara Falls, it is light and unimportant. The collision was on January 22, when the river was full of ice, due to a high west and southwest wind. The ferry had left Fort Erie at about 2 P. M. bound for Buffalo, but became embedded in the ice and unable to free herself. Although the master found that it was impossible to make for the draws, he had enough control of his course to avoid any abutment and he passed under one of the spans, carrying away the superstructure of the ferry, the injury complained of. The respondent challenges the master's seamanship and the seaworthiness of the ferry and the judge found in its favor as to both; but these issues are irrelevant as we view the law.

Even if the statute had required the respondent to keep a tug above the bridge at all seasons, it is at least doubtful that

[1] "The said bridge shall be constructed so as not materially to obstruct the navigation of the Niagara River; the said bridge shall have two draws, one across the Black Rock Harbour, and the other across the main channel of the river, which said draws shall be of ample width to give free and unobstructed passage to all steamboats and other vessels navigating the said river; the said draws shall be at all times tended and moved at the expense of the said company so as not to hinder unnecessarily the passage of any steamboats or vessels; from sundown until sunrise during the season of navigation, suitable lights shall be maintained upon the said bridge to guide vessels and steamboats approaching the draws; and for assisting the passage of any vessel through the said draws, the said Company shall at all times keep in readiness one or more steamboats, or steam tugs, suitable for towing the said vessels through the said draws, and shall tow all the said vessels through the same, whenever requested so to do by the officers of such vessels on their regular trips, up and down the river or harbor, without charge; and the said Company shall be liable to pay the owners of any steamboat or vessel, or of the cargoes thereof, all damages which they may sustain by reason of any neglect of the provisions of this section."

the ferry was of the class for whose benefit the duty was imposed. The tug was to be maintained only "for assisting the passage of any vessel through said draws," and it is hard to see how the ferry was such a vessel. If the tug had been at hand and had been able to break her free, the ferry would have gone to her pier upstream; if the tug had been unable to do this, neverless the ferry would not have been able to go through the draws, for the floes necessarily follow the current. We need not decide the point, however, because we think that the statute required the respondent to keep a tug ready only "during the season of navigation." Syntactically perhaps, it is possible to confine the phrase, "during the season of navigation," to the clause which requires lights to be maintained; moreover, it can be argued that the phrase, "at all times," appearing in the clause which imposed the duty to tend and move the draws, meant "all the year," and did not change its meaning when it was used later in the same sentence. But the sentence starts off without seasonal limitation and would normally be unrestricted in its application. The phrase, "at all times," was not necessary to make it so, but it was appropriate to prescribe that the draws should be tended at all hours; and that was its apparent purpose, in contrast with the immediately following phrase, "from sundown to sunrise." Coming to the whole clause in which that phrase, "from sundown to sunrise," itself occurs, its composition favors treating the duty to maintain lights and the duty to keep ready the tug as connected, for the lights "to guide vessels * * * approaching the draws" are an apparent complement of the tug's assistance of "the passage of any vessel through said draws"; lights being of course lighted only "from sundown until sunrise," but the tug being ready "at all times." Be all this as it may, when we consider the consequence of construing the words as the libellant wishes, the conclusion becomes inevitable. The tug is by hypothesis to help vessels through the draws, and to do so she must either take them in tow or keep close alongside. Yet, if the libellant's interpretation be right, although her course is to be lighted in spring, summer and autumn, in winter—when the nights are longest and weather is severest—she and her charge are to find their way without lights through what is admittedly an exceptionally difficult and dangerous passage. Such a construction of the act is merely incredible, and proves beyond peradventure that the phrase, "during the season of navigation," applies to the maintenance as well of the tug, as of the lights. We must suppose that in winter such rare vessels as chose to use the river were expected to choose their own occasions at their risk, and that their necessities did not justify imposing upon the respondent the expense of maintaining a tug, although an actual passage through the bridge must always be provided.

Moreover, even were there a doubt, which there is not, the respondent's open and well-known practice for many years to put the tug out of commission during the winter, would lay it. The libellant does indeed challenge the sufficiency of the testimony to support the judge's finding as to this practice, but it was amply supported. Not only should we be altogether unwarranted in holding it "clearly erroneous," but we should ourselves have found that the practice existed; and practice is certainly of great importance in the interpretation of the New York statute. City of New York v. New York City Ry. Co., 193 N.Y. 543, 86 N.E. 565; Town of Amherst v. County of Erie, 236 App.Div. 58, 61, 258 N.Y.S. 76, affirmed 260 N.Y. 361, 183 N.E. 851. The doctrine is not peculiar to that state; presumably it obtains equally in Canada, though we have been able to find no Canadian decisions upon the point. Our decision in The International, 2 Cir., 256 F. 192, though it concerned the same statute, has no bearing upon the situation now before us.

Decree affirmed.